IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

MORGAN STANLEY SMITH
BARNEY LLC,
          Plaintiff,

    vs.

ROBERT SEVCIK,

        Defendant.

Case No. 1:21-cv-001120-AA
**OPINION AND ORDER**

AIKEN, District Judge:

      Plaintiff Morgan Stanley Smith Barney LLC ("Morgan Stanley") brings this action against its former employee Robert Sevcik. Morgan Stanley alleges that, since his termination, Sevcik has been soliciting Morgan Stanley clients and misrepresenting the circumstances of his termination and may have confidential client information that belongs to Morgan Stanley. Morgan Stanley alleges that this conduct violates several employment-related agreements.

Morgan Stanley now moves for a temporary restraining order and preliminary injunction that, among other things, (1) prohibits Sevcik and his new firm from soliciting Morgan Stanley clients covered by the agreements and from using or retaining information that Sevcik took from Morgan Stanley and (2) orders Sevcik to return any information he took. Doc. 4. Morgan Stanley served Sevcik shortly after filing this action, and Sevcik has appeared to defend against the motion and action. Docs. 12, 14. This matter has been fully briefed since August 3, 2021, and the Court has determined it suitable for resolution without a hearing. LR 7-1(d)(1). For the following reasons, Morgan Stanley's request for a temporary restraining order is DENIED.

## BACKGROUND

Morgan Stanley is a broker-dealer registered with the Securities and Exchange Commission and a member firm of the Financial Industry Regulatory Authority ("FINRA"). Sevcik worked as a financial advisor in Morgan Stanley's, or its predecessors', Medford, Oregon office from 2008 until July 12, 2021, when he was fired for alleged misconduct. Decl. of James Maddux (doc. 7) ¶ 7; Decl. of George Kane (doc. 5) ¶ 3; Decl. of Robert Sevcik (doc. 17) ¶ 2. Sevcik joined D.A. Davidson & Co., a competitor of Morgan Stanley, on July 26, 2021. Sevcik Decl. ¶ 7.

While at Morgan Stanley, Sevcik's clients included some he had inherited from another former financial advisor, James Maddux. Maddux retired from Morgan Stanley in 2017 and entered the firm's Former Advisor Program ("FAP"). Kane Decl. ¶¶ 3–6. As part of the FAP, Maddux agreed to give up his license and encourage his

clients to remain with Morgan Stanley after his departure. His client accounts would be serviced by active Morgan Stanley financial advisors and, for a five-year period, Maddux would receive a declining portion of the revenue generated by the accounts.

In the summer of 2017, Sevcik signed a memorandum of understanding in which he agreed to serve as an active advisor for some of the Maddux accounts through the FAP (the "FAP Agreement"). Doc. 1 Ex. A. These included accounts previously serviced under five "Joint Production Number[s]." *Id.* at 2. The FAP Agreement includes a non-solicitation provision that provides:

> following the termination of your employment for any reason, for a period of one year or the remainder of the Payment Period, whichever is longer, you will not solicit or attempt to solicit, directly or indirectly, any of the Clients who were served by you or any other Active Advisor in connection with this FAP Arrangement, or whose names became known to you in connection with this FAP Arrangement[.]"

*Id.* at 3. It also includes provisions protecting "Confidential Trade Secret Information," including client contact information, which prohibit Sevcik from using or retaining such information after "the suspension or termination of [his] employment relationship with Morgan Stanley for any reason[.]" *Id.* Sevcik also agreed that Morgan Stanley "will be entitled to injunctive relief" for a breach of those provisions and "will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Morgan Stanley or to protect and preserve the status quo." *Id.* at 4.

Later in 2017, Sevcik also signed a document acknowledging and confirming his adherence to the Morgan Stanley Wealth Management Joint Production Arrangement Policy (the "Policy") and, once again, agreeing to serve as an active

advisor in the FAP program. Doc. 1 Ex. B. The Policy includes similar non-solicitation and client information provisions:

> [F]or a period of one (1) year following any Joint Producer's termination of employment for any reason, each departing Joint Producer agrees not to solicit any Client Accounts or retain any information regarding any such Client Accounts, including, but not limited to, a list of Morgan Stanley client names and/or client contact information.

*Id.* at § IV.  It also provides: "[i]n the event of a breach of any of the restrictions contained or incorporated herein by reference, each Joint Producer agrees that the Firm will suffer immediate and irreparable harm, that money damages will not be adequate to compensation (*sic*) the Firm, and the Firm will therefore be entitled to appropriate injunctive relief." *Id.*

As a Morgan Stanley employee, Sevcik had also agreed to abide by the firm's Code of Conduct (doc. 1 ex. C). The Code of Conduct requires employees to "protect all confidential information" by, among other things, "only access[ing] confidential information that you need and are authorized to see" and "transmit[ting] confidential information only to [Morgan Stanley] employees and agents with a legitimate business reason to know." *Id.* at 1. "Confidential information" includes "the identity of [Morgan Stanley's] clients." *Id.* The Code also provides that this "obligation to protect confidential information continues even after your employment at Morgan Stanley ends." *Id.* at 2.

Morgan Stanley terminated Sevcik on July 12, 2021, for misconduct. Kane Decl. ¶ 9. According to Morgan Stanley, Sevcik "began secretly diverting commission income away from" the FAP arrangement "including by improperly executing client

trades outside of the" arrangement. *Id.* Sevcik's conduct started "almost immediately around the time of the consummation of" the FAP Agreement, "depriving Mr. Maddux of tens of thousands of dollars of retirement income." *Id.* "It took years for Morgan Stanley to uncover" Sevcik's conduct, but when it did, it terminated him as soon as it had completed its investigation. *Id.*

Since his termination, Sevcik has communicated with some of his former clients. According to Morgan Stanley, several clients whose accounts are under the FAP Agreement have reported that Sevcik "is reaching out and/or speaking" with them and that Sevcik has been making misleading and disparaging statements about the circumstances of his termination. *See e.g., Id.* ¶¶ 16–17. For example, clients with the initials M.C. and J. and P.T. reported that Sevcik "reached out to them to advise them that he was no longer working at Morgan Stanley and would circle back with them when he joined a new firm." Decl. of Norman Fincher (doc. 6) ¶ 3. Once he joined D.A. Davidson, Sevcik "communicated with clients about moving their accounts from Morgan Stanley to his new firm." *Id.* Another client, R.K., told Maddux that Sevcik "indicated . . . that Morgan Stanley was under regulatory investigation" and "made [Sevcik] a 'fall guy,'" "suggesting that it was Morgan Stanley, and not [Sevcik] who had engaged in unlawful behavior." Maddux Decl. ¶¶ 11–12. Similarly, clients J. and K.N. reported that "during the course of conversation with [Sevcik], [he] told them that Morgan Stanley is a big national firm that doesn't care about 'the little guy' and that [he] wanted to be with a firm that is regional and really cares for their clients" and "was recruited by two firms." Decl. of Paul B. Smith (doc. 13) ¶ 3. Clients

T.P. and T.T. reported that Sevcik "had called them and said I can't help you out right now but I'll be in touch in a couple of weeks." Decl. of Thomas Elliot Stone (doc. 24) ¶ 3. Morgan Stanley asserts that Sevcik's comments about Morgan Stanley and the circumstances of his termination harms Morgan Stanley's reputation with its clients. Kane Decl. ¶ 17.

Morgan Stanley "believes that [Sevcik] may have retained information pertaining to Morgan Stanley clients, including their contact information, since [he] reached out to Morgan Stanley clients immediately upon his termination." Kane Decl. ¶ 20.

Additionally, on July 28, 2021, D.A. Davidson sent a mass mailing of postcards announcing that it had hired Sevcik. Supp. Decl. of George Kane (doc. 27) ¶ 2. Doc. 27 Ex. 1; Decl. of Desiree Molloy (doc. 28) ¶ 5; Doc. 28 Ex. A. On August 4, 2021, Maddux, who is also a FAP client, received one of the postcards. Supp. Kane Decl. ¶ 4, 6. The front of the postcard states:

> D.A. Davidson & Co. is pleased to announce that Shane Sevcik has joined our Medford office.
>
> With unwavering integrity, nationally-recognized research, and comprehensive and personalized guidance, D.A. Davidson has been helping individual investors, families and businesses realize their financial goals for 85 years.

Doc. 27 Ex. 1 at 1. And the back of the postcard states:

> At D.A. Davidson Companies, we harvest a wealth of financial service opportunities, create smart strategies and personalized solutions, and serve them up with straightforward advice. We're with you at every step—leveraging expertise that crosses industries. Our approach is rooted in the values of our employee-owned company that is as independent as you are.

*Id.* at 2. The postcard also includes contact information for Sevcik and its Medford office. Morgan Stanley believes that because at least one FAP client received a D.A. Davidson postcard "it was sent on a widespread basis to additional FAP clients, including others who—like Mr. Maddux—did not reach out to [Sevcik]." Supp. Kane Decl. ¶ 5.

Sevcik disputes Morgan Stanley's characterization of the circumstances surrounding his termination. According to Sevcik, his conduct was an "honest mistake based on [his] misunderstanding" of the scope of the FAP Agreement. Sevcik Decl. ¶ 17. When he signed the FAP Agreement, Sevcik believed "that new transactional business after retirement was outside the FAP agreement and should be ticketed under the current existing team's rep code." *Id.* He continued operating under this understanding for four years, during which time no one told him that he was violating the FAP Agreement. *Id.* When Morgan Stanley did confront him about the issue, Sevcik "offered to pay back . . . any money received that was incompliant with" the FAP Agreement, but Morgan Stanley rejected his offer and terminated him. *Id.* Sevcik also asserts that because "[t]ransactional business is a very small part of [his] business, the amount involved is not anywhere close to 'tens of thousands of dollars.'" *Id.*

Sevcik also disputes Morgan Stanley's characterization of his post-termination conduct. Sevcik asserts that he has not initiated contact with any clients covered by the FAP Agreement since he was fired. *Id.* ¶¶ 11, 13. Instead, he claims:

> Almost immediately after I was terminated, my clients began contacting
> me to tell me that they had already received calls from Morgan Stanley
> about my departure and asking to keep their business with Morgan
> Stanley. Most of the clients who reached out to me asked if they could
> keep their accounts with me.

*Id.* ¶ 11. Sevcik told the clients who had affirmatively asked if they could continue

working with him "that they could do so." *Id.* ¶ 13. Sevcik also asserts that clients

have contacted him after hearing that he was fired for misconduct. Supp. Decl. of

Robert Sevcik (doc. 25) ¶¶ 5–8, 10. He explains that "[w]hen clients have contacted

me and asked about my departure from Morgan Stanley, I have explained what

happened[,]" based on his understanding of the circumstances. Sevcik Decl. ¶ 18.

Sevcik specifically disputes that he reached out to several clients discussed

above and the nature of those conversations. He spent years building "relationships

of trust and confidence with all [his] clients," including those covered by the FAP

Agreement. *Id.* ¶ 5. And he has "personal or social relationships with many of [his]

clients through [his] activities outside [his] work as a financial advisor." *Id.* at ¶ 4.

Sevcik asserts that M.C. reached out to him via text message and offers a

screen shot of the conversation, which took place the day after Sevcik was fired. *Id.* ¶

12. M.C. texted: "I just got a call that you bailed from MS. Should I be concerned?

Hope everything is okay with you." *Id.* Sevcik responded:

> No, I'm so sorry about this whole process. I'm changing firms. I'm not
> allowed to call my clients until my license transfers over, so I'm stuck in
> limbo for about a week. As soon as I'm officially in my new office I'll
> reach out to you to walk you through all the details and I'd love to keep
> working with you. In the mean time the remaining advisors will help if
> you need anything. They are very good and capable.

*Id*. When asked where he had transferred, Sevcik responded that he was not allowed to disclose that information yet, "[b]ut it's a firm I'm confident my clients, especially conversative clients will be happier with." *Id*.

J. and K.N. are Sevcik's close personal friends. Supp. Sevcik Decl. ¶ 6. Sevcik asserts that they contacted him directly and that he "provided [his] frank opinion that D.A. Davidson would be a better fit for them than Morgan Stanley." *Id*. He also told them that he was fired because he "made an honest mistake about coding certain transactions under the FAP Agreement." *Id*.

Sevcik believes that T.T. is a "Terry T." who sent Sevcik a Facebook message two days after Sevcik was fired. *Id*. ¶ 7. The message stated: "I just got a call that you aren't at Morgan Stanley. Let me know if this is true. Kinda freaks me out because I liked you there." *Id*. ¶ 7. Sevcik responded:

> The financial industry is very weird. I am actually changing firms. However I'm not allowed to contact clients until it's completed. As soon as the quiet period is over I'll call you. I should be at my new firm by the end of next week and allowed to reach out to clients.

*Id*. Because Sevcik is not sure whether Terry T. is covered by the FAP Agreement, he has not spoken with or otherwise communicated with Terry T. since that response. *Id*. ¶ 8.

Sevcik also asserts that the D.A. Davidson postcards were not targeted at FAP clients. D.A. Davidson sent them as part of a bulk mailing to 4,239 households, using a commercial mailing list that it had purchased. Molloy Decl. ¶¶ 4, 6; Doc. 28 Ex. B. The mailing list consisted of households in the Medford, Ashland, and Jacksonville zip codes with income over $150,000. Molloy Decl. ¶ 4.

Finally, Sevcik denies that he retained Morgan Stanley's confidential information. Sevcik Decl. ¶ 9. He notes that, because he was not expecting to be fired, he "did not have any opportunity to prepare for [his] departure, even if [he] had wanted to." *Id*. He also notes that FINRA rules and guidance "instruct[] firms that they should provide reasonable contact information . . . of the departing representative when customers ask for such information." *Id*. ¶ 16 (citing FINRA's Regulatory Notice 19-10).

## PROCEDURAL HISTORY

Morgan Stanley filed this action, asserting claims for breach of contract and breach of the duty of loyalty, and motion for a temporary restraining order and preliminary injunction on July 30, 2021. Docs. 1, 4. In its motion, Morgan Stanley seeks an order that prohibits Sevcik, "directly or indirectly, and whether alone or in concert with others," including others affiliated with D.A. Davidson, from doing the following:

- Soliciting or attempting to solicit any Morgan Stanley client serviced by Sevcik or any other Active Advisor in connection with the FAP, or whose names became known to him in connection with the FAP, while working for Morgan Stanley, with respect to any line of business in which Morgan Stanley or any of its affiliates is engaged (excluding Sevcik's immediate family);

- Soliciting any Morgan Stanley clients or household accounts that are subject to the Policy (excluding Sevcik's immediate family);

- Using, disclosing, or transmitting for any purpose, any records, documents, or information relating to Morgan Stanley's clients, business or marketing strategies, or business operations; or

- Retaining such information in any form.

Mot. for TRO and PI (doc. 4) at 2–4. Morgan Stanley also asks the Court to order Sevcik and anyone acting in concert with him "to return to Morgan Stanley all" such information "within twenty-four (24) hours of notice to" Sevcik "or his counsel of the terms of the Court's Order." *Id.* at 4.

Sevcik appeared in this action on August 2, 2021. Doc. 14. On August 3, 2021, he filed his Response (doc. 16) opposing the motion and a Motion to Compel Arbitration and Dismiss or Stay Proceedings (doc. 18). Morgan Stanley filed its Reply (doc. 23) later that day. The parties also filed several declarations between July 30 30 and August 5, 2021, supporting their positions on the motion for preliminary injunctive relief. Docs. 5–7, 13, 17, 24, 25, 27, 28.

## DISCUSSION

The same general legal standards govern temporary restraining orders and preliminary injunctions. Fed. R. Civ. P. 65; *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

A plaintiff seeking such relief generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4) an injunction is in the public interest. *Winter,* 555 U.S. at 22 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a

preliminary injunction). So long as all four parts of the *Winter* test are applied, a preliminary injunction may issue if a plaintiff demonstrates that "there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

Having reviewed Morgan Stanley's motion and the related filings, the Court finds that, at most, Morgan Stanley has shown "serious questions" going to the merits of the case, that the balance of equities weighs slightly in its favor, and that public interest does not favor either side. Thus, even if Morgan Stanley clearly established that it would suffer irreparable harm in the absence of injunctive relief, it would not be entitled to its requested relief.

## I.    *Likelihood of Success on the Merits*

Morgan Stanley asserts claims against Sevcik for breach of contract and breach of the duty of loyalty. Compl. (doc. 1) ¶¶ 29–35. In this motion, Morgan Stanley asserts that Sevcik breached (1) the non-solicitation provision of the FAP Agreement and Policy in his communications with Morgan Stanley clients, (2) the confidentiality provisions in the FAP Agreement, Policy, and Code of Conduct by retaining and using client contact information to solicit the clients, and (3) his duty of loyalty to Morgan Stanley by violating those contractual obligations and disparaging the firm.

Although Sevcik argues that the non-solicitation provisions are not enforceable under Oregon law,[1] courts within this District have found that an alleged violation of limited non-solicitation clauses similar to those in the FAP Agreement and Policy can sustain a claim for breach of contract, when considered in the context of a preliminary injunction. *See e.g.*, *Millennium Health, LLC v. Barba*, No. 3:20-cv-02035-HZ, 2021 WL 1254349, at *9 (D. Or. Apr. 5, 2021) (granting preliminary injunction enforcing one-year non-solicitation provision); *Brinton Ventures, Inc. v. Searle*, 248 F. Supp. 3d 1029, 1038–39 (D. Or. 2017) (granting preliminary injunction enforcing one-year non-solicitation provision after reforming to omit restriction with respect to plaintiff's "prospective customers"); *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1223, 1228 (D. Or. 2016) (granting preliminary injunction enforcing two-year non-solicitation provision).

The parties also dispute the meaning of the non-solicitation provisions and the nature of Sevcik's post-termination communications with FAP clients. As mentioned, the FAP Agreement provides that Sevcik cannot "solicit or attempt to solicit, directly or indirectly, any of the Clients who were served . . . in connection with this FAP Arrangement, or whose names became known to [him] in connection with this FAP Arrangement" during the non-solicitation period. Doc. 1 Ex. A at 3. The Policy provides that Sevcik cannot "solicit any Client Accounts" during the non-solicitation period. Doc. 1 Ex. B at § IV. Both contracts provide that "the term 'solicit' includes

---

[1] The FAP Agreement, Policy, and Code of Conduct excerpt do not appear to have choice of law provisions, but the parties briefing suggests that they agree that Morgan Stanley's breach of contract claim is governed by Oregon law.

initiation of any contact with customers for the purposes of conducting business with or transferring accounts to any other person or firm that does business in any line of business in which Morgan Stanley or any of its affiliates is engaged[.]" *Id.*; Doc. 1 Ex. A at 3.

Sevcik denies Morgan Stanley's assertions that he reached out to any Morgan Stanley clients and asserts instead that they all contacted him after they heard that he had left the firm. In Sevcik's view the non-solicitation provisions only prohibit "initiation" of contact with former clients aimed at diverting their business from Morgan Stanley. In other words, he suggests that the provisions prohibit him from contacting clients with the intent to talk to them about transferring their accounts, but they do not prohibit him from bringing up the subject if the clients contact him. Neither party has offered any formal contract interpretation analysis and, on this limited record, both parties' interpretations appear reasonable.

The D.A. Davidson postcards arguably qualify an indirect attempt to solicit. They appear to be D.A. Davidson's "initiation of contact with" at least one "customer" on Sevcik's behalf. Given the sheer number of postcards mailed and the mailing list criteria, it is likely that other FAP clients also received a postcard. And the messages on the postcard subtly invite and encourage recipients to contact Sevcik about conducting business with him at D.A. Davidson.

Thus, the record before the Court shows one arguable instance of solicitation (and suggests at least a few more) under Sevcik's interpretation of the provisions and up to four additional instances under Morgan Stanley's interpretation. The Court

concludes that Morgan Stanley has, at most, shown there are "serious questions" concerning Sevcik's alleged breach of the non-solicitation provisions.

By contrast, the Court concludes that Morgan Stanley has not met its burden to show that Sevcik used or retained client contact information after his termination, in violation of the confidentiality provisions. Sevcik denies Morgan Stanley's claim that he "may have" taken client contact information with him and asserts that he has not personally reached out to any former clients. Sevcik offered affirmative evidence contradicting Morgan Stanley's assertions that Sevcik "reached out" to two clients. The only indirect communication with Morgan Stanley clients, the D.A. Davidson postcard sent to Maddux, was accomplished using a commercial mailing list that D.A. Davidson bought. On this record, the Court cannot find that Morgan Stanley's belief that Sevcik took and used client information is anything more than speculation.

Additionally, on this record, the Court is not prepared to reach conclusions regarding Morgan Stanley's claim for breach of the duty of loyalty. Morgan Stanley offers no authority or legal argument supporting this claim. And, like Morgan's Stanley's claims that Sevcik took client information and solicited its clients, its claim that Sevcik misrepresented the circumstances of his termination in a way that harms Morgan Stanley's reputation is hotly disputed.

In sum, Morgan Stanley has, at most, demonstrated "serious questions" regarding its claim that Sevcik breached the non-solicitation provisions.

## II.    *Likelihood of Irreparable Harm*

The parties dispute whether the solicitation of Morgan Stanley's clients constitutes irreparable harm. Indeed, "[c]ourts are split on whether an investment firm can show irreparable harm from the loss of investment clients to a former employee." *JP Morgan Secs.   LLC v. Krich*, No. CV-15-00979-PHX-DGC, 2015 WL 3604199, at * 4 (D. Ariz. June 8, 2015) (collecting cases). The Court need not resolve that dispute here, though, because Morgan Stanley has not shown that any client has transferred their account from Morgan Stanley to D.A. Davidson. And, given the circumstances and content of Sevcik's communications with clients, which as discussed above are strongly disputed, the Court cannot find that it is likely that any improper transfers are imminent.

Although "irreparable harm" generally encompasses harm to a company's goodwill and reputation, Morgan Stanley has not presented evidence that it will likely suffer harm to its goodwill or reputation in the absence of temporary injunctive relief. *Stuhlbarg Intern. Sales Co., Inc. v. John D. Bush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001). The evidence before the Court does not clearly show that Sevcik's statements concerning the circumstances of his termination are false or misleading.

In sum, the Court cannot find that Morgan Stanley has shown a likelihood, rather than a mere "possibility," that it will suffer some irreparable harm in the form of lost client relationships and accompanying financial damage in the absence of temporary injunctive relief that prohibits Sevcik from soliciting its clients. *Winter*, 555 U.S. at 22.

III.   *Balance of Equities and Public Interest*

Sevcik argues that the equities weigh heavily against the injunction. In his view, the "mere possibility that Morgan Stanley will suffer economic harm" through the loss of a "miniscule fraction of its commission revenue" is far outweighed by the "virtual certainty that Sevcik will be prevented from earning a livelihood in the only business he knows, should he be enjoined from continuing to service his clients while this dispute is pending." Resp. (doc. 16) at 15. Although the terms of the requested injunction would burden Sevcik, they would not bar him from working as a financial advisor in Medford or even from working with former clients, as long as Sevcik refrains from soliciting those clients and, instead, works only with those who seek him out and request his services. At the same time, the Court has considered the fact that Morgan Stanley is a substantial player in its market. Thus, the Court finds that the balance of equities favors Morgan Stanley but cannot find that they tip "sharply" in Morgan Stanley's favor.

Sevcik also argues that Morgan Stanley's requested injunction is not in the public interest because it "would interfere with customers' free choice of whom they will choose as their financial advisor." Resp. (doc. 16) at 16. As noted, the terms of the injunction would not prohibit Sevcik from working with Morgan Stanley clients who request his services. In cases involving restraints on trade, Oregon law reflects a balance between competing public policies. "The freedom to pursue one's chosen occupation is in tension with the freedom of contract, and the advocate of competition must grapple with the argument that noncompete agreements are economically

advantageous because they protect costly investments." *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisitions Co., Inc.*, 648 F. App'x 709, 712 (9th Cir. 2016). Because the non-solicitation provisions arguably comport with Oregon law, "an injunction enforcing [them] is not antithetical to any public interest." *Id*. The Court therefore concludes that the public interest does not weigh strongly in favor of either side.

## CONCLUSION

On this record, the Court finds that, at most, Morgan Stanley has shown "serious questions" going to the merits of the case and that the balance of equities weighs slightly in its favor, but it has not shown a likelihood of irreparable harm, and the public interest does not favor either side. Morgan Stanley has, therefore, failed to show that it is entitled to preliminary injunctive relief and Morgan Stanley's Motion for a Temporary Restraining Order (doc. 4) is DENIED.

The Court will contact the parties to schedule a telephonic status conference to discuss a briefing schedule for Sevcik's Motion to Compel Arbitration (doc. 18) and whether and how Morgan Stanley wishes to proceed on its request for a preliminary injunction.

IT IS SO ORDERED.

Dated this  6th  day of August 2021.


_____/s/Ann Aiken_____

Ann Aiken
United States District Judge